UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ELAINE M. BEYE, *pro se*,                          :
                                                    :
                              Plaintiff,            :
                                                    :          **OPINION AND ORDER**
              -against-                             :          13-CV-5484 (DLI)
                                                    :
CAROLYN W. COLVIN,[1]                               :
Acting Commissioner of Social Security,            :
                                                    :
                              Defendant.            :
-----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

On October 22, 2010, Plaintiff Elaine M. Beye ("Plaintiff") filed an application, *pro se*,[2]

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the

"Act"), alleging that she became disabled on June 1, 2010; the application was given a protective

filing date of September 29, 2010. (*See* Certified Administrative Record ("R."), Dkt. Entry No.

16 at 114-19, 125.) Her application was denied and Plaintiff requested a hearing. (R. 73-79, 80.)

On February 6, 2012, Plaintiff appeared *pro se* and testified at a hearing before Administrative

Law Judge Barry L. Williams ("the ALJ"). (R. 22-54.) By a decision dated August 15, 2012,

the ALJ concluded Plaintiff was not disabled within the meaning of the Act. (R. 6-18.) On

August 9, 2013, the ALJ's decision became the Commissioner's final decision when the Appeals

Council denied Plaintiff's request for review. (R. 1-4.)

---

[1]         Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner Carolyn W. Colvin is
substituted for Commissioner Michael J. Astrue as the defendant in this action.

[2]         *Pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v.
Rowe*, 449 U.S. 5, 9 (1980) (citation omitted). Courts should "interpret [such papers] to raise the strongest
arguments that they suggest." *Forsyth v. Fed'n Emp't & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citation
and quotation marks omitted). Though a court need not act as an advocate for *pro se* litigants, in such cases "there is
a greater burden and a correlative greater responsibility upon the district court to insure that constitutional
deprivations are redressed and that justice is done." *Davis v. Kelly*, 160 F.3d 917, 922 (2d Cir. 1998) (citation
omitted).

Pursuant to 42 U.S.C. § 405(g), Plaintiff filed the instant appeal seeking judicial review of the denial of benefits since September 29, 2010. (*See* Complaint ("Compl."), Dkt. Entry No. 1.) Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Commissioner moved for judgment on the pleadings, seeking affirmance of the denial of benefits. (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 14.) The Court liberally construes *pro se* Plaintiff's submission in response as a cross-motion for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. (*See* Letter from *Pro Se* Plaintiff Opposing Def's Mot. ("Opp."), Dkt. Entry No. 15.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted. Plaintiff's cross-motion for judgment on the pleadings is denied and this appeal is dismissed.

## BACKGROUND

### A.     Non-Medical and Self-Reported Evidence

Plaintiff was born in 1958 (R. 32, 114, 125.) and has a high school education. (R. 32, 130.) Although she reported that she stopped working on March 1, 2008, when her temporary job ended, she also reported having worked as a temporary receptionist in 2009, a self-employed babysitter in 2005, and a typist. (R. 129, 130, 143-44.) According to her Disability Report, Plaintiff's impairments became severe enough to prevent her from working on June 1, 2010. (R. 114, 125.) She alleged disability due to pain in her arms, shoulders, and legs; a sporadic limp; and high blood pressure. (R. 129.) At the time of application, Plaintiff was taking Amitriptyline (an antidepressant), aspirin, Hydrochlorothiazide (for blood pressure), Lisinopril (for blood pressure), a multivitamin, Nexium (for heartburn), and Prednisone (a steroid, for pain). (R. 132.)

In a Function Report completed on November 11, 2010, Plaintiff stated that she lived in an apartment with her family. (R. 135-52.) On a typical day, she prepared her child for school,

walked him to the bus, and went to any scheduled doctor appointments.  (R. 135.)  Plaintiff was able to take care of her personal grooming and hygiene, but occasionally felt pain when raising her hands, forcing her to take her time.  (R. 136.)  She prepared daily meals, did laundry, cleaned her room, but required assistance in taking out the garbage.  (R. 137.)  She went outside twice a day and could take public transportation without assistance.  (R. 138.)  Plaintiff went shopping for food, clothing, plants, and medicine, and could handle her finances.  (R. 138-39.)  She read and watched television every day, and went to church twice a month.  (R. 139.)  She visited friends or went to a movie, if she was "feeling good," but stayed home if she was feeling too much pain.  (R. 139-40.)  According to Plaintiff, she was unable to stand for extended periods of time, and was unable to lift, kneel, or squat, and needed to hold a railing in order to climb stairs, but did walk for exercise.  (R. 140.)  Plaintiff estimated that she could walk for one block before stopping to rest for fifteen minutes.  (R. 141.)  She had no problems paying attention, finishing what she started, following instructions, or getting along with authority figures.  (*Id.*)  Stress or changes in schedule caused her to slow down, and she needed occasional reminders to remember things.  (R. 137, 142.)

In a Disability Report–Appeal form filed after she requested a hearing, Plaintiff stated that the pain in her shoulders, hands, and legs was worsening and that her blood pressure was "up and down."  (R. 154-59.)  She found it difficult to stand for long periods of time and was having headaches.  (R. 154.)  She no longer was taking Hydrochlorothiazide (for blood pressure), but she continued to take the other medications.  (R. 157.)

**B.**     **Medical Evidence**

On June 11, 2010, Richmond University Medical Center ("Richmond") took x-rays of Plaintiff's left shoulder. (R. 164, *repeated at* R. 576, 802.) The x-rays revealed no fractures, dislocation, or bonylytic changes. (*Id.*)

On June 29, 2010, Plaintiff underwent a laparoscopic cholecystectomy at Richmond. (R. 714-17, 691-713, 718-20.) On a July 19, 2010 follow-up evaluation, the surgeon, Dr. David Cornell, noted that she was doing "remarkably well" and discharged her from further treatment. (R. 573-75.)

On August 13, 2010, Maryann Lee, M.D., a rheumatologist, examined Plaintiff. (R. 808-09.) Plaintiff complained of pain in her arms, shoulders, and legs for the past four months, with increasing achiness. (R. 808.) Partial relief to the increased pain had been rendered through Plaintiff's ingestion of Tylenol and Amitriptyline. (*Id.*) Dr. Lee noted that Plaintiff was overweight, with a normal blood pressure of 118/80, and a largely normal musculoskeletal system. (*Id.*) The rotator cuff of the right shoulder did show some impingement, particularly with respect to internal rotation, and some tenderness at the acromioclavicular (AC) joint. (*Id.*) Plaintiff also had limited range of motion in her left shoulder. (*Id.*) Plaintiff suffers from crepitus in both knees, however, there were no effusions. (*Id.*) Dr. Lee further noted that fibromyalgia tender points were not present. (*Id.*) Dr. Lee opined that Plaintiff likely had osteoarthritis, bursitis, and rotator cuff syndrome. (*Id.*)

On August 27, 2010, Dr. Lee saw Plaintiff for a follow-up appointment, at which time Plaintiff reported pain in both shoulders and legs, particularly in the knees. (R. 110.) Dr. Lee noted some tenderness in Plaintiff's right shoulder, and stated that she was considering a diagnosis of polymyalgia rheumatica. (*Id.*) She prescribed Prednisone (a steroid) at a dosage of 20 mg. (*Id.*)

On September 7, 2010, Plaintiff reported to Dr. Lee that she had stopped taking Prednisone because it made her "jittery," although it had improved her symptoms. (R. 109.) Dr. Lee then decreased the Prednisone dosage to 10 mg. (*Id.*)

On October 8, 2010, Plaintiff again reported to Dr. Lee an improvement in her symptoms in response to the Prednisone. (R. 108.) Yet, Plaintiff continued to complain about stiffness and pain, particularly in her hands and shoulders, as well as some swelling in her hands. (*Id.*) Results of examinations of Plaintiff's head, neck, heart, and lungs were normal, and there was no synovitis in her joints. (*Id.*) Plaintiff had some tenderness in her shoulders and thighs. (*Id.*) Dr. Lee increased her Prednisone dosage to 15 mg. (*Id.*)

On October 10, 2010, plaintiff went to Richmond's emergency room complaining of chest pain. (R. 479.) X-rays of her chest showed minimal increased densities at the right base of the heart with no evidence of pleural fluid, normal heart size, and a midline trachea. (R. 799.)

On October 28, 2010, Plaintiff attended a follow-up appointment and complained of diffuse joint pain. (R. 479.) She was alert, fully oriented and in no acute distress. (*Id.*) Her chest was tender to palpation and results of examinations of her abdomen and lungs were normal. (*Id.*) The following were also assessed: chest pain (likely musculoskeletal), joint pain, hypertension, gastroesophageal reflux disease ("GERD"), type II diabetes, anemia, high cholesterol, and obesity. (R. 480.) An electrocardiogram ("EKG"), rheumatology follow-up, and a nutritional consultation were recommended. (*Id.*) Metformin was prescribed for Plaintiff's diabetes, and she was counseled on proper diet and exercise. (*Id.*)

From November 3 through November 11, 2010, Plaintiff was hospitalized at Richmond for complaints of epigastric pain and chest pain. (R. 214, 364, 565, 173-89, 213-98, 303-436, 565-67.) On admission, she had no shortness of breath, dyspnea, or orthopnea. (R. 214.) She

had nausea without vomiting.  (*Id.*)  On examination, Plaintiff's air entry was equal on both sides, with no added sounds, and there was no heart murmur.  (*Id.*)  There was tenderness in the epigastric area of her abdomen, but no rebound, guarding, or tenderness, and bowel sounds were positive with regular intensity.  (R. 214-15.)  An examination of the central nervous system revealed no focal deficits.  (R. 215.)  On admission, Plaintiff was diagnosed with acute coronary syndrome and given two doses of nitroglycerin.  (R. 354.)  A chest x-ray showed haziness at the lung bases, heart size within normal limits, and an unremarkable trachea and mediastinum.  (R. 798.)

On November 4, 2010, Plaintiff was found to be alert, oriented, in stable condition, and no longer feeling chest pain.  (R. 374, 376.)  A physical examination proved normal and an EKG was unremarkable.  (R. 376.)

On November 5, 2010, a stress test was attempted and caused renewed chest pain.  (R. 379.)

On November 6, 2010, the stress test was readministered without complications.  (R. 382.)

A report dated November 8, 2010 noted the following results of the exercise stress test and EKG:  (1) mild left ventricle diastolic dysfunction and mitral regurgitation; (2) no left-ventricular wall motion abnormality; and (3) a normal ejection fraction of approximately 60%.  (R. 215, 312.)  This report essentially found that, while Plaintiff's heart muscles do not relax in an ideal manner and her heart may fill with blood too slowly, her left heart ventricle pumps out a normal amount of blood with each heartbeat.  (R. 13.)

On November 9, 2010, an x-ray of Plaintiff's chest showed no infiltrates or pleural fluid. (R. 797.) Her heart size was at the upper limit of the normal range, and her trachea, mediastinum, and diaphragms were unremarkable. (*Id.*)

On November 10, 2010, a left-heart catheterization, left ventriculogram, and selective coronary angiography showed a normal coronary tree, moderate left-ventricle dysfunction, and hypertensive cardiomyopathy. (R. 309-10.) However, an EKG performed on Plaintiff was determined to be abnormal. (R. 314.)

On November 11, 2010, results of an EKG were normal and Plaintiff was discharged in stable condition. (R. 175, *repeated at* R. 313; R. 215, *repeated at* R. 566.) Diagnoses on discharge included non-ST-elevation myocardial infarction and hypertensive cardiomyopathy. (R. 216, *repeated at* R. 567.) The doctor prescribed Prednisone, Metformin, a multivitamin, Amlodipine, Nexium, aspirin, Lisinopril, and Lopressor. (R 215, *repeated at* R. 566.) Plaintiff was permitted to engage in physical activity and exercise as tolerated. (R. 217.)

On November 8, 2010, Dr. Lee completed a questionnaire, in which she stated that she had diagnosed Plaintiff with polymyalgia rheumatica, whose accompanying symptoms were stiffness of the hands and shoulders with some swelling of the hands. (R. 190.) Plaintiff had been prescribed Prednisone to address these infirmities and had responded positively to the medication. (R. 191.) Dr. Lee stated that she could not provide a medical opinion regarding the Plaintiff's ability to do work-related activities. (R. 194.)

On November 23, 2010, Plaintiff returned to Dr. Lee and reported taking only 10 mg of Prednisone, because the 15 mg dosage caused her palpitations. (R. 106.) She stated that she was "feeling better," but had developed calf pain the previous day and was having difficulty walking. (*Id.*) Upon examination, Dr. Lee discovered tenderness and induration over Plaintiff's left calf,

but Homan's sign was found to be negative. (*Id.*) Examinations of the head, neck, heart, and lungs proved normal. (*Id.*) Dr. Lee diagnosed Plaintiff with stable polymyalgia rheumatica and continued Prednisone at 10 mg. (*Id.*) She wanted to rule out a diagnosis of deep-vein thrombosis in the left calf. (*Id.*)

On December 6, 2010, Iqbal Teli, M.D., performed a consultative internal medicine examination. (R. 197-201.) Plaintiff reported a history of sharp lower back pain that occurred intermittently on a daily basis, lasting for approximately ten minutes at a time. (R. 197.) Plaintiff also reported a history of chest pain and that she had been diagnosed with ventricular dysfunction following her admission to Richmond. (*Id.*) She also reported shortness of breath after walking for three blocks. (*Id.*) She informed Dr. Teli that she was taking aspirin, Lisinopril, and Metformin. (*Id.*) Plaintiff reported her ability to engage in the normal activities of daily living, including cooking and cleaning five days a week, showering and dressing daily, reading, watching television, and shopping. (*Id.*)

Upon Dr. Teli administered another physical examination on Plaintiff, he determined that she had a normal gait and stance without the use of assistive devices. (R. 198.) She did not need help changing for the examination, getting on or off the examination table, and was able to rise from her chair without difficulty. (*Id.*) She could not walk on her heels or toes due to a feeling of instability and could only squat up to 60% due to back pain. (*Id.*) A straight-leg-raising test was negative on both sides. (*Id.*) Plaintiff had full ranges of motion in her shoulders, elbows, forearms, wrists, knees, and ankles. (R. 198-99.) Other than a restricted ability to flex forward, she had a normal range of motion in her lumbar spine. (R. 198.) Chest, lung, and abdominal examinations were found to be normal. (*Id.*) Plaintiff's hand and finger dexterity were intact,

and she had full grip strength in both hands.  (R. 199.)  Her reflexes were physiologic and equal,

she had full strength in her arms and legs, and no sensory deficit was noted.  (*Id.*)

Dr. Teli diagnosed a history of lower back pain, a history of diabetes mellitus, a history

of left ventricular dysfunction, and a stable prognosis.  (*Id.*)  Dr. Teli opined that Plaintiff was

mildly restricted for squatting, bending, lifting, and carrying heavy items, and that she should

avoid exertion due to her cardiac conditions.  (*Id.*)  X-rays revealed degenerative changes of the

lumbosacral spine; however, the x-rays produced no evidence of acute fracture, dislocation, or

destructive bony lesion in the left knee.  (R. 201-02.)  The joint spaces in the left knee were

relatively well maintained and the impression was of no significant bony abnormality.  (*Id.*)

On December 15, 2010, Plaintiff went to Richmond's cardiac clinic and reported that she

was "doing okay."  (R. 482.)  Plaintiff was advised to continue her current medications and

follow up in six months.  (R. 483.)  On January 3, 2011, she went to Richmond's podiatry clinic

and reported no complaints at the time.  (R. 484.)

On January 5, 2011, Plaintiff went to Richmond's emergency room for a sinus headache.

R. 591-609.)  X-rays of her chest were negative.  (R. 796.)

On January 6, 2011, W. Wells, M.D., a state agency medical consultant, reviewed

Plaintiff's medical records and opined that Plaintiff did not meet the requirements of any of the

impairments in the Social Security Administration Listings of Impairments for disability

evaluation.[3]  (R. 16, 806.)  Dr. Wells opined that Plaintiff could stand and walk for six of the

---

[3]  "By regulation, the Commissioner [of Social Security] has set forth a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected.  For both adults and children, 'if an applicant satisfied the Listings, the applicant was presumed to be disabled, and did not have to prove "whether he [or she] actually can perform his [or her] own prior work or other work."'"  *Hamedallah ex rel. E.B. v. Asrue*, 876 F. Supp. 2d 133, 141-42 (N.D.N.Y. 2012) (quoting *Lusher ex rel. Justice v. Commissioner of Social Security*, 2008 WL 2242652, at *6 (N.D.N.Y. 2008) and *Sullivan v. Zebley*, 493 U.S. 521 (1990), respectively).

eight hours in a workday, and lift up to ten pounds frequently and up to twenty pounds occasionally.  (*Id.*)

On January 24, 2011, Plaintiff went to Richmond for a follow-up appointment.  (R. 487-88.)  She reported occasional chest pain, headaches, and joint pains.  (*Id.*)  Medical staff assessed Plaintiff's complaints of headaches and joint pains, in addition to hypertension, GERD, and diabetes, whereupon she was administered naproxen.  (*Id.*)  Plaintiff was released from Richmond that same day.  (*Id.*)

On March 8, 2011, Plaintiff met with Dr. Lee and reported doing well on 5 mg of Prednisone.  (R. 105.)  She had started exercising, but had had some incidents of left lateral epicondyle pain (*i.e.*, tennis elbow) and abdominal complaints, but no chest pain.  (*Id.*)  Results of examinations of Plaintiff's head, neck, heart, lungs, and abdomen were normal.  (*Id.*)  A joint examination revealed only tenderness in the left lateral epicondyle.  (*Id.*)  Dr. Lee suspected that gastritis was causing the abdominal pain, and lowered the Prednisone dosage to 2.5 mg.  (*Id.*)

On April 5, 2011, Plaintiff went to Richmond's emergency room with left-sided abdominal pain and chest pain.  (R. 556-59, *repeated at* R. 619-22; R. 610-33.)  A physical examination showed Plaintiff to be in mild painful distress but otherwise normal.  (R. 556.)  A CT scan of Plaintiff's chest, abdomen, and pelvis revealed the following: (1) no evidence of an aortic aneurysm or dissection; (2) a small anterior mediastinal soft tissue density, most likely representing small residual thymic tissue; (3) a small fat-containing umbilical hernia; and (4) several calcified densities within the small bowel, perhaps representing foreign bodies.  (R. 551, *repeated at* R. 563, 794.)  After spending six hours under observation, Plaintiff was resting comfortably and reported no active complaints.  (R. 622.)  Plaintiff was discharged in stable

condition, with a diagnosis of nonspecific chest pain and a prescription including Pepcid, Maalox, and Extra Strength Tylenol. (*Id.*)

Plaintiff also went to the podiatry clinic on April 5, 2011, where it was noted that her diabetes caused no neurological problems with her feet. (R. 473.) The podiatrist assessed fungal infections of the toenails (onychomycosis), bunion deformities, and flat feet. (*Id.*)

An April 6, 2011 EKG showed a normal sinus rhythm but an abnormal QT reading. (R. 443.) At a follow-up appointment that same day at the medical clinic, the staff assessed Plaintiff for diabetes, dyslipidemia, GERD, obesity, smoking, hypertension, cardiomyopathy, chronic anemia, and rheumatological problems. (R. 475.)

On April 11, 2011, Plaintiff went to the orthotic clinic and received a prescription for semi-flexible orthotics to treat her flat feet. (R. 589-90.)

On April 18, 2011, Plaintiff met with Dr. Lee and informed her that Plaintiff was unable to tolerate Prednisone, even at the 2.5 mg dosage. (R. 104.) Dr. Lee examined Plaintiff and found her head, neck, heart, and lung to be normal. (*Id.*) A joint examination revealed impingement of both shoulders and pain on the lateral aspects of both legs. (*Id.*) Dr. Lee diagnosed Plaintiff with gastritis and side effects from Prednisone. (*Id.*) Dr. Lee discontinued the Prednisone treatment and prescribed Voltaren gel for pain relief. (*Id.*) Dr. Lee also administered an injection to Plaintiff's right shoulder. (*Id.*)

On April 28, 2011, Plaintiff went to Richmond's medical clinic for a routine follow-up. (R. 471-72.) She continued to complain of epigastric pain and midsternal chest pain. (*Id.*) On examination, her chest was tender to palpation, her lungs were clear to auscultation, and her abdomen was soft and nontender with positive bowel sounds. (*Id.*) Peptic ulcer disease ("PUD") and musculoskeletal causes were assessed and ruled out. (*Id.*)

On June 8, 2011, Plaintiff went to Richmond's gastrology clinic. (R. 492-93.) She reported a history of GERD and complained of intermittent epigastric and abdominal plain for two months. (R. 492.) An abdominal examination revealed tenderness. (*Id.*) An esophagogastroduodenoscopy ("EGD") was scheduled, and Plaintiff's Nexium dosage was increased. (R. 493.)

On July 6, 2011, an EGD was performed, revealing mild gastritis, without hemorrhage. (R. 527, 528-29, 544-46.) On August 15, 2011, a solid gastric emptying study showed accelerated solid gastric emptying. (R. 526, 543, 792.) A second solid gastric emptying study performed a week later showed normal solid gastric emptying. (R. 542, 791.)

On August 24, 2011, Plaintiff saw Dr. Lee and said she was "doing okay" but was experiencing substantial pain in her right leg and continued gastrointestinal discomfort. (R. 103.) An examination of her joints revealed no synovitis; however, it did reveal pain on the right side of Plaintiff's lower leg. (*Id.*) Dr. Lee ordered an x-ray of Plaintiff's right leg and delayed restarting medications. (*Id.*)

On October 14, 2011, Plaintiff went to Richmond's emergency room with a complaint of right elbow pain that had lasted one day. (R. 634-52.) Upon examination, Plaintiff's elbow was found to be tender, but had a full range of motion with no effusion or distal neurovascular deficit. (R. 643.) Plaintiff was diagnosed with elbow tendonitis, administered ibuprofen and discharged. (R. 644, 648.)

On October 15, 2011, an ultrasound of Plaintiff's abdomen showed normal-sized kidneys, no dilated ducts, and no evidence of hydronephrosis or space-occupying lesions on either side. (R. 530, *repeated at* R. 789.) The impression revealed gall stones. (R. 531, 790.)

On October 18, 2011, Plaintiff returned to Dr. Lee who noted that Plaintiff's elbow tendonitis had resolved, but Plaintiff's gastric issues required continued investigation. (R. 102.) Dr. Lee suspected a pancreatic cyst. (*Id.*) Plaintiff continued to have joint pains, particularly in the hands and legs. (*Id.*) A physical examination revealed tenderness in plaintiff's right elbow. (*Id.*) The x-ray of Plaintiff's right leg was normal. (*Id.*) Lab results showed a high level of inflammation. (*Id.*) Dr. Lee diagnosed Plaintiff with polymyalgia rheumatica that "likely needs some treatment." (*Id.*)

On October 19, 2011, Plaintiff had a follow-up appointment at Richmond's gastrology clinic, at which time she reported experiencing positive relief with her medication. (R. 501-02.)

On November 20, 2011, Plaintiff went to Richmond's emergency room for pain in her left knee and ankle after falling up the stairs. (R. 653-71.) Upon physical examination, medical staff discovered mild tenderness of the knee over the patella, but Plaintiff maintained a full range of motion. (R. 669.) There was moderate swelling and tenderness in Plaintiff's ankle, and a limited range of motion due to the pain. (*Id.*) X-rays of the ankle showed soft-tissue swelling and a suspected cortical fracture of the distal fibula, but knee x-rays showed no fracture or dislocation. (R. 787.) The clinical impression was of a knee contusion and an ankle sprain. (R. 670.) Plaintiff was given Tylenol and an ice pack. (*Id.*) Her knee was wrapped and a splint was placed on her ankle. (*Id.*) Plaintiff was issued crutches and discharged. (*Id.*)

On November 23, 2011, Plaintiff went to Richmond's orthopedic clinic for her ankle sprain and was fitted with a short-leg cast. (R. 504.) She was told she could bear weight on the ankle with the use of the crutches. (*Id.*)

On December 30, 2011, Plaintiff followed up with Dr. Lee. (R. 100.) A physical examination revealed pain in her right shoulder and right knee, but no sinovitis. (*Id.*) Dr. Lee

prescribed methotrexate and informed Plaintiff of its potential to cause gastrointestinal complications. (*Id.*)

On January 9, 2012, Plaintiff returned to Richmond's emergency room complaining of pain in her left foot and ankle. (R. 682.) X-rays of the left foot showed no fracture or dislocation and minimal degenerative changes. (R. 786.) The clinical impression was foot pain due to a heel spur. (R. 682.) Plaintiff's foot was wrapped and she was given Motrin to treat the pain. (*Id.*)

On January 19, 2012, Plaintiff went to Richmond's surgery clinic to evaluate an umbilical hernia. (R. 509.) Doctors recommended that Plaintiff lose weight and stop smoking. (*Id.*)

On January 23, 2012, the soft cast was removed from her left ankle. (R. 510.)

On February 1, 2012, a CT scan of Plaintiff's abdomen and pelvis revealed no evidence of incisional hernia. (R. 522, 783.) The CT scan further revealed tiny fat-containing umbilical and right inguinal hernias that were thought to be without clinical significance. (*Id.*) However, multiple patchy confluent opacities present in both lung bases were discovered. (*Id.*) Clinical correlation was required to exclude pneumonias. (*Id.*) No gross abnormality was revealed in Plaintiff's pelvis upon ultrasound. (R. 523, 533, 785.)

On February 2, 2012, Plaintiff went to Richmond complaining of epigastric discomfort. (R. 513-14.) Plaintiff was prescribed Simethicone on a trial basis. (R. 513.)

On February 3, 2012, Plaintiff went to Richmond's orthotic clinic for treatment of flat feet. (R. 464.) She was ambulating without difficulty, reported having no complaints, and was told to follow up in one year. (*Id.*)

C.      **Testimonial Evidence**

At the February 6, 2012 disability hearing, Plaintiff testified to the following: (1) she lived with her two sons, ages 12 and 35; (2) she had taken a bus to the hearing; (3) she was unable to work due to pain in her hands, legs, and knees; (4) she was 5'8" or 5'9" tall and weighed 265 pounds; (5) Dr. Lee treated Plaintiff for arthritis for six or seven months; (6) Plaintiff took folic acid once a day for pain in her right hand and the relief lasted for approximately ten to fifteen minutes; (7) she also felt pain in both shoulders; and (8) the shoulder pain was not constant, but could last for up to four days. (R. 32-40.)

Plaintiff described the pain in her legs as constant. (R. 40-41.) According to Plaintiff, her high blood pressure was controlled by medication. (R. 42.) She had GERD that she previously had thought was a cardiac condition and for which she was taking Nexium. (*Id.*) She controlled her diabetes by taking Metformin and a B-complex vitamin. (R. 43.)

In 2009, Plaintiff had worked at a temporary, part-time job as a receptionist for two or three months and had been going to school. (R. 44.) She also had earned some extra money as a babysitter in 2005. (*Id.*)

Louis Szollosy, Jr., a vocational expert, testified at the hearing. (R. 45-52; R. 89-90.) The ALJ asked Mr. Szollosy whether a hypothetical individual of the same age, education, and work background as Plaintiff who could perform work with light exertion, but never would be able to climb ladders, ropes, or scaffolds, and only occasionally would be able to climb ramps, balance, stoop, kneel, crouch, or crawl ultimately would be able to find any work. (R. 47.) Mr. Szollosy testified that such an individual could perform certain jobs, including: (1) mail clerk (*Dictionary of Occupational Titles*[4] ("DOT") Code No. 209.657-026), of which there were approximately 120,000 jobs nationally and 13,000 jobs within the New York City region; (2) information clerk (DOT Code No. 236.367-018), consisting of approximately 997,000 jobs

---

[4] *See generally* United States Department of Labor, *Dictionary of Occupational Titles* (4th ed. rev. 1991).

nationally and 95,000 jobs regionally; and (3) office helper (DOT Code No. 239.567-010), consisting of approximately 85,000 jobs nationally and 9,000 jobs regionally.  (*Id.*)

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants seeking disability benefits under the Act may appeal the Commissioner's decision by seeking judicial review and bringing an action in federal district court "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  In reviewing the final determination of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010); *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted).   The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *see Schaal*, 134 F.3d at 501.  If the district court finds that there is substantial evidence supporting both the claimant's and Commissioner's position, it must rule for the Commissioner, as that position is based on the factfinder's determination.  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal citations omitted); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's decision where substantial evidence supported either side).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (internal citations omitted). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). Unlike judges, ALJs have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quotations omitted).

**B.     Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Further, the claimant's impairment must have been of such severity that she is unable to do her previous work or, considering her age, education, and work experience, she could not have engaged in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B). The claimant bears the initial burden of proving disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or

psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged" and which leads to the conclusion that the individual has a disability. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(A), (D); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. The inquiry ends at the earliest step at which the ALJ determines that the claimant is either disabled or not disabled. First, the claimant is not disabled if she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, and work experience. Impairments are "severe" if they significantly limit a claimant's physical or mental ability to conduct basic work activities. If the claimant does not have a severe impairment, she is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, the ALJ will find the claimant disabled if her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(e). At the fourth step, the claimant is not disabled if she possesses the RFC to perform past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ considers factors such as age, education, and work experience alongside her RFC to determine whether the claimant could adjust to other work that exists in the national economy. If the claimant could make such an adjustment, she is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). At this final step, the burden shifts to the Commissioner to demonstrate that the

claimant could perform other work.  *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F. 2d at 642).

## C.    The ALJ's Decision

On August 15, 2012, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Act.  (R. 6-18.)  The ALJ followed the five-step inquiry in making his determination.  (R. 11-18.)  At the first step, he determined that Plaintiff had performed no substantial gainful activity since September 29, 2010.  (R. 11.)  At the second step, the ALJ found that Plaintiff established severe impairments of:  (1) borderline ischemia with hypertensive cardiomyopathy and a non-ST-elevation myocardial infarction; (2) polymyalgia rheumatica affecting the upper extremities; and (3) morbid obesity.  (*Id*.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 12.)  Accordingly, the ALJ proceeded to steps four and five and determined that Plaintiff has the RFC to perform a wide range of light work as defined in 20 C.F.R. § 416.967(b).  (R. 12-18.) Specifically, the ALJ determined that Plaintiff has no past relevant work and, given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform, such as mail clerk, information clerk and office helper. (R. 17-18.)  On August 9, 2013, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.  (R. 1-4.)

## D.    Application

The Commissioner moves for judgment on the pleadings, seeking affirmance of the denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to determine that Plaintiff was not disabled and the ALJ's factual findings are supported by

substantial evidence. (*See generally* Def. Mem.) The Court liberally construes Plaintiff's *pro se* submission as a cross-motion for judgment on the pleadings on the ground that the ALJ erred by failing to develop the record regarding the frequency and severity of the pain she experiences as a result of her polymyalgia rheumatica.[5] (*See generally* Opp.)

The ALJ's findings with respect to the first four steps of his analysis are not contested. The only dispute is whether the ALJ properly found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, given her age, education, work experience, and, specifically, RFC. The Court concludes that the ALJ applied the appropriate legal standards and the decision is supported by substantial evidence. Plaintiff's arguments to the contrary are unfounded.

An impairment or combination of impairments is not severe unless it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Basic work activities include: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). Moreover, the disability resulting from a severe impairment must be "expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1509, 416.909; *see Burgess v. Astrue*, 537 F.3d 117, 119 (2d Cir. 2008); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

The ALJ found that Plaintiff's borderline ischemia with hypertensive cardiomyopathy

---

[5] In reviewing a *pro se* filing, the court is mindful that, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations omitted). Accordingly, the court will construe plaintiff's pleadings and papers "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

and non-ST-elevation myocardial infarction, polymyalgia rheumatica, and morbid obesity constituted severe impairments. (R. 11-12.) He noted that these impairments result in "vocationally significant limitations and, [with respect to Plaintiff,] have lasted at a 'severe level' for a continuous period of more than 12 months." (*Id*.) However, the ALJ found that these impairments do not meet or equal the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 12.) Because Plaintiff did not have any past relevant work, the ALJ properly proceeded to the fifth step of the inquiry. (R. 17.)

Plaintiff asserts that the ALJ failed to consider the "frequency and full extent of the pain" she suffers. (Opp. Letter, Dkt. Entry No. 15.) However, contrary to Plaintiff's contentions, the ALJ thoroughly examined the record and considered the duration, frequency, and extent of her symptoms in determining her RFC. (R. 15-16.)

The ALJ first considered Plaintiff's RFC in light of the objective medical evidence. (R. 12-15.) There is no indication that Plaintiff's cardiac condition restricts her ability to do light work. An exercise stress test performed on July 6, 2009 was borderline positive for cardiac ischemia, but a follow-up exercise stress EKG on July 17, 2009 did not suggest cardiac ischemia. (R. 13, 299-302.) When hospitalized from November 3 to November 11, 2010 with complaints of epigastric and chest pain, Plaintiff underwent a battery of tests. (R. 215, 309-310, 312, 314, 376, 379, 382.) Some mild cardiac conditions were noted during the course of these tests, but Plaintiff had passed a stress test and had registered a normal EKG before she was discharged.

Plaintiff also visited Richmond on April 5, 2011 with complaints of abdominal and chest pain which resolved during her six hours of emergency room treatment. (R. 556-59, 619-22, 610-33, 622.) Plaintiff was discharged in stable condition, with a diagnosis of nonspecific chest pain. (R. 622.)

Plaintiff has presented insufficient evidence to substantiate a claim that polymyalgia rheumatica renders her unable to engage in light office work. Dr. Lee continually treated Plaintiff for this condition as she complained of pain in her wrists, shoulders, knees, and joints, which was substantiated by medical evidence. (R. 808, 110, 108, 190-91, 105-06.) Notably, Dr. Lee stated that she could not provide a medical opinion regarding the Plaintiff's ability to do work-related activities. (R. 194.) During this time, Plaintiff was able to shop, care for her children, take care of her hygiene, travel, walk, go to church and perform other daily functions. (R. 197-201.)

Dr. Iqbal Teli, an internal medicine consultative examiner retained by the Social Security Administration, conducted a comprehensive medical examination of Plaintiff on December 6, 2010 after the alleged onset disability date. (R. 14, 16, 197-201.) During the examination, Plaintiff reported her ability to cook and clean five days a week, shower and dress daily, read, watch television, and go shopping. (R. 197-201.) Plaintiff had a normal gait and stance, and she used no assistive devices. (R. 198.) She did not need help changing for the examination, getting on or off the examination table, and was able to rise from her chair without difficulty. (*Id.*) She could not walk on her heels or toes due to a feeling of instability and could only squat up to 60% due to back pain. (*Id.*) A straight-leg-raising test was negative on both sides. (*Id.*) Plaintiff had full ranges of motion in her shoulders, elbows, forearms, wrists, knees, and ankles. (R. 198-99.) Other than a restricted ability to flex forward, she had a normal range of motion in her lumbar spine. (R. 198.) Plaintiff's hand and finger dexterity were intact, and she had full grip strength in both hands. (R. 199.) Dr. Teli opined that Plaintiff was mildly restricted for squatting, bending, lifting, and carrying weight, and that she should avoid exertion due to her cardiac conditions. (*Id.*) Dr. Teli's prognosis was that Plaintiff was stable and did not suffer from a

physical disability.  (R. 14, 199.)

X-rays revealed degenerative changes of the lumbosacral spine but no evidence of acute fracture, dislocation, or destructive bony lesion in the left knee was discovered.  (R. 201-02.) The joint spaces in the left knee were relatively well maintained, and the impression was of no significant bony abnormality.  (*Id.*)  As the ALJ correctly noted, Dr. Teli's examination indicates that Plaintiff's polymyalgia rheumatica only imposes mild limitations on her ability to do work. (R. 16.)

The evidence further shows that Plaintiff's other ailments were transient conditions, which fail to meet the 12-month duration requirement for receiving disability benefits.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Roat v. Barnhart*, 717 F. Supp. 2d 241, 263 (N.D.N.Y. 2010) (court found that plaintiff's claims of obesity constituted a transient medical condition which did not satisfy the 12-month duration requirement for receiving disability benefits).  The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment."  (R. 15.)  Specifically, he noted that no treating physician had opined that significant functional limitations resulted from these impairments. (*Id.*)

Notwithstanding those conclusions, the ALJ went on to consider the factors set forth by the Commissioner in Social Security Ruling 96-7p to determine if they supported a finding that Plaintiff's degree of impairment extended beyond what was supported by objective medical evidence.  (R. 15.)  These factors include: Plaintiff's daily activities; location, duration, frequency, and intensity of symptoms; side effects of medication; treatment and medications

received; other measures taken to relieve pain; and functional limitations resulting from pain or symptoms. (*Id.*) The ALJ determined that Plaintiff's daily activities essentially were full and she retained functionality during the day, as the evidence indicated. (R. 16.)

Furthermore, the ALJ noted that Plaintiff's medications were not unusual in type or dosage, and that there was no evidence that they have resulted in any pernicious side effects. (R. 16.) Plaintiff even stated in her "Disability Report–Appeals" that she suffers no side effects. (R. 16; 157.) There also was no evidence that Plaintiff has received treatment for her cardiac condition since June 2011. (*Id.*)

Significantly, Dr. Lee, Plaintiff's treating physician, declined to offer an opinion regarding Plaintiff's ability to perform work related activities, and Dr. Teli's examination supports the conclusion that Plaintiff is not precluded from performing work-related activities. (R. 16; 194; 197-201.) Dr. Wells also opined that Plaintiff retained the functional capacity for a full range of light exertion. (R. 16; 806.) The ALJ concluded that Plaintiff's allegations regarding the extent of her disability do not comport with the 96-7p factors or with the objective medical evidence. There is substantial evidence in support of his determination.

Finally, the ALJ relied on the expert testimony of the vocational expert to determine that jobs exist in significant numbers in the national economy that an individual of Plaintiff's same age, education, work background, and RFC could perform. (R. 45-52; R. 89-90.) The vocational expert testified that such an individual could perform the jobs of mail clerk, information clerk, and office helper, and that these jobs exist in significant numbers in both the national and local economies. (*Id.*; *see also* DOT Code Nos. 209.657-026, 236.367-018, 239.567-010).

The ALJ properly evaluated Plaintiff's testimony, medical evidence, and expert testimony and correctly followed the five-step analysis in reaching his ultimate conclusion

regarding Plaintiff's disability status. Accordingly, Plaintiff properly was denied disability benefits.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted. Plaintiff's cross-motion for judgment on the pleadings is denied and her appeal is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      February 22, 2016

_____/s/_____
DORA L. IRIZARRY
United States District Judge
